UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANDRE L. SCOTT,

               Petitioner,          **DECISION AND ORDER**

     -vs-                          **No. 1:15-cv-00043-MAT**

STEVEN RACETTE,

               Respondent.

_____

## INTRODUCTION

Pro se petitioner André L. Scott ("Petitioner"), presently incarcerated in Respondent's custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges the constitutionality of the judgment entered against him in New York State, Genesee County Court (Noonan, J.) on October 28, 2010, following a jury verdict convicting him of arson, first-degree burglary, attempted second-degree murder, and second-degree arson.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction here at issue stems from Petitioner's alleged involvement in an accelerant-spiked fire that erupted on the night of January 24, 2009, at the rooming house of Steven Crandall ("Steven"), the father of Petitioner's former paramour, April Crandall ("Crandall").

## I.   The Jury Trial

### A.   The Prosecution's Case

April testified that she and Petitioner began dating in March of 2008, and moved in together in June. At some point prior to the fire, she had moved out of his apartment because they were not

getting along. However, they still talked on a daily basis. (T.262, 270).[1] Around the end of December 2008, or the beginning of January 2009, April testified that she told Petitioner she did not want to talk to him or see him at all. (T.262). According to April, this made Petitioner "very upset," and he became "really mad" when she "kept ignoring his phone calls." (T.263, 264, 266-67). On January 24, 2009, Petitioner left her a voicemail stating it "was over[,]" after which he listed off the names of her mother, father, and brothers, and a number of other family members, and stated that "they were done" and it was "over for them, too." (T.263). April related that Petitioner asserted, "I'm going to kill your mom, your dad, your brothers[.]" (T.265). April told her father, Steven, about this message. (Id.).

Steven testified that sometime in early December of 2008, April and Petitioner paid a visit to him at his apartment on the second floor of 12 Elm Street[2] in Batavia, New York. After they all went out for lunch, Petitioner and April dropped Steven off at his apartment. Steven testified that Petitioner did not enter the basement of 12 Elm Street on that occasion, and did not visit his residence again. (T.323-25).

---

[1]

Citations to "T." in parentheses refer to pages from the trial transcript.

[2]

Steven shared his apartment with one roommate. The house at 12 Elm Street was a three-story structure that had been divided into three apartments, one on each floor. (T.329-30).

A few days before the fire, Steven testified, there were some phone calls and texts among him, Petitioner, and April; he was aware that the two of them were having problems. One text from Petitioner to Steven included a "revealing picture" of his daughter. (T.326).

April's cousin, William Sachs ("Sachs"), testified that a few days before the fire on January 24, 2009, Sachs had a conversation with Petitioner, who was upset about April being pregnant but not sure who the father was. (T.304). Petitioner also was "angry at [April's] father" because "supposedly they had some words on the phone." (Id.). Petitioner told Sachs that "some stuff was going down, and he was going to take care of it," by "get[ting] rid of things and tak[ing] care of people." (T.296, 301). Sachs also testified that Petitioner remarked that he "was going to get rid of part of [Sachs'] family[,]" meaning "April, Steve, stuff like that." (T.296). Sachs told Petitioner "not to do anything stupid" that would land him back in jail. (T.296). Sachs testified that he liked Petitioner and that they had hung out together on occasion. (T.301).

On the day of the fire, Steven testified, Petitioner called him sometime before 7 p.m., and was "talking to [him] with some harsh words." (T.328). Steven chastised Petitioner about the inappropriate photograph of April, telling him "don't be the streets; be an example on the streets," and "[t]hat's when [Petitioner] said[,] ["]you don't want me to come out there."

(T.327). Steven described Petitioner's tone of voice as "[t]hreatening, harsh[,]" and "[m]eaningful." (T.328). Steven, who was on parole at the time,[3] immediately called his parole officer, Christopher Van Schaik ("P.O. Van Schaik") and left voicemail messages reporting Petitioner's threats. (T.328-29; 545-47). Steven and his roommate proceeded to watch a DVD in their living room. (T.329-31). Steven recalled hearing a car in the driveway at about 10:00 p.m.; he looked out of the window but did not see anything. A little later, Steven testified, he heard something outside his door; he paused the DVD but did not hear anything else. (T.332). Steven then recalled hearing a noise outside; he looked out the window but could not figure out what had made the sound. (Id.).

At around the same time, Steven's downstairs neighbor, Terry Luczak ("Luczak") heard someone pass through the side-door of the house, which is used to access the second and third floor apartments. She also heard "very, very heavy footsteps" "coming up the stairs, from the apartment, the outside door, the upstairs [i.e., Steven's] apartment." (T.379, 382; T.383-85). Luczak said that the footsteps, which sounded "like [they were from] two different people[,]" stopped at the door to her apartment that led "out to the hall, the stairwell that goes up to the upstairs apartments[.]" (T.379-80, 381-82, 383). Almost immediately, Luczak

---

[3] Steven was on parole for three grand larcenies and possession of hydrocodone tablets without a prescription. He had previous convictions for forgery, assault, and possession of drugs. (T.336-37).

testified, there was an explosion that shook the building. In the space between the bottom of the door and the floor, she could see flames in the hallway. (T.379-81). Then she heard the outside door close. (Id.). She and her roommate left through a different door, located at the front of the house. (T.386).

At around the same time, Steven also heard a "loud boom" against his apartment door. Steven testified that he opened the door to see a fire burning in the carpeted stairwell at his doorstep. He grabbed a fire extinguisher, but he was driven back inside due to the flames. He and his roommate evacuated by means of the fire escape. (T.333-35).

Members of the Batavia Fire Department ("BFD") responded to the scene and extinguished the fire. Batavia Police Department ("BPD") Detective Charles Dudek ("Det. Dudek") arrived soon thereafter. Upon entering the side door off the driveway, he noticed a "strong odor of gasoline." (T.394). While going down the cellar stairs, Det. Dudek encountered BFD Captain James Steinbrenner ("Capt. Steinbrenner") holding a Clorox bottle, and he had the cap off. (T.395). Det. Dudek asked Capt. Steinbrenner to replace the Clorox bottle where he found it because he was not wearing gloves. (T.396). Det. Dudek testified that he also noticed a white matchbook on the second stair from the bottom. (Id.).

Captain Michael Drew ("Capt. Drew") of the BFD arrived after the fire was extinguished and smelled gasoline immediately upon entering. (T.509, 516-18, 532-33). Capt. Drew observed a "deep

charring burn" to the stairs and landing and concluded that the fire had been very hot and unusually low to the ground. Based on this pattern, Capt. Drew believed that a heat source, such as a flammable liquid on the staircase, accelerated the fire. Capt. Drew testified that he found no evidence that the fire's origin was electrical, accidental, or weather-related, and he concluded that it had been deliberately set. (T.520-37). Capt. Drew indicated that the Clorox bottle and cap, as well as multiple floor and carpet samples from the scene of the fire, were packaged and sent to the New York State Police forensic laboratory for testing.

The day after the fire, Det. Dudek took statements from Steven and April. He and a colleague, Detective Sergeant Corona ("Det. Sgt. Corona"), then traveled to Rochester and enlisted the help of the New York State Division of Parole ("Parole Division") to locate Petitioner. Det. Dudek, Det. Sgt. Corona, P.O. Van Schaik, and two other parole officers staked out Petitioner's apartment complex. At about 8:50 p.m., they saw Petitioner's black GMC Yukon SUV into the parking lot. (T.400-01). Petitioner was approached by one of the parole officers and taken into custody. The other two parole officers searched the vehicle and recovered two cell phones. P.O. Van Schaik testified that Petitioner had a "strong odor" of alcohol on his breath. (T.401-02; T.551, 553-54, 585). Petitioner was transported to the Parole Division office in Rochester where he was administered an Alco-Sensor by P.O. Van Schaik, who also obtained a buccal swab from him to test for drugs.

(T.403-08, 494-95).[4] The buccal swab subsequently was provided to Det. Dudek, who sent it to the New York State Police Forensic Investigation Center ("FIC") for DNA testing. (T.403-06, 408, 494-95, 552-58).

Dr. Frank Padula, a forensic scientist at the FIC testified as an expert in fire debris analysis, and stated that his testing of the Clorox bottle and samples of wood and carpet from 12 Elm Street showed that they all contained gasoline. (T.604-16). Peter Lewis ("Lewis"), a laboratory scientist at the FCI, testified regarding his DNA testing on the various items of physical evidence recovered at the fire scene and the buccal swab taken from Petitioner. He obtained swabs from the matchbook, the Clorox bottle cap, the bottle's handle, and various points on the bottle itself. He testified that the cap of the Clorox bottle contained a mixture of Petitioner's DNA and the DNA of another unidentified person, with Petitioner's DNA being the major contributor. (T.668-73). Defining the term "major contributor," Lewis testified that the possibility of selecting an unrelated individual with a single tandem repeat ("STR") DNA profile matching that of the major contributor was less than 1 in 300 billion. (T.673; see also T.669-70). Lewis explained that the handle of the Clorox bottle contained a DNA mixture that was consistent with Petitioner's DNA profile and the profile DNA of

---

[4]

Petitioner testified that in 2008, he was on parole for possession of a loaded handgun. As a condition of parole, Petitioner consented to warrantless searches of his person, vehicle, and home by the Parole Division. (T.582-83). He acknowledged this in his testimony. (T.905-06, 949-50).

another donor. (T.666-67). Lewis stated that the body of the Clorox bottle yielded a partial STR DNA profile that was consistent with Petitioner's DNA profile and the profiles of two additional donors. (T.667-68). Lewis stated that his laboratory used the term "consistent" when some alleles were missing in the comparison profiles or there was an absence of any DNA because there was not much on the swab to begin with. (T.665). Finally, Lewis testified that he developed a partial DNA profile from the matchbook that was consistent with Petitioner's DNA. (T.665-66).

## B. The Defense Case

Petitioner recalled meeting April in early February of 2008; she moved in with him in mid-July of 2008. (T.903-04). Petitioner testified that by mid-October of 2008, they were not getting along, and April moved out. However, Petitioner said, the two maintained daily contact and continued to have a sexual relationship. (T.906-07, 916, 965). Petitioner testified stated that after breaking up with April, he got back together with an old girlfriend, Heather Bentley ("Bentley"), who was an acquaintance of April's.

In November of 2008, Petitioner finalized plans to sell a car to April's cousin, Sachs. (T.907-09). On January 18, 2009, Petitioner testified, April told him that she was pregnant and that he might be the father. (T.909-10). On January 21, 2009, Petitioner disclosed to April that he was having sex with Bentley. According

to Petitioner, April became angry upon learning this; she began obsessively phoning him, but he ignored her calls. (T.918, 964). Petitioner acknowledged that he sent April at least 41 text messages in the two days preceding the fire. (T.970-71). Petitioner also conceded that he may have sent April as many as 45 text messages on the day of the fire, and that his last text to her that day was sent at 6:43 p.m. (T.962-64).

Petitioner testified that he met April's father, Steven, once at his apartment, on the day that they all had gone out for pizza in Batavia. According to Petitioner, even after April moved out, he and Steven shared friendly text messages. (T.914-15). Petitioner admitted that the day before the fire, he sent Steven a topless photograph of April via text message, but testified that he did so accidentally. (T.918-19, 922, 948, 960-62).

On the night of the fire, Petitioner testified, he went to a party hosted by his friend Denise Colon ("Colon") at her house in Rochester at around 7:00 p.m. He stayed there until between 10:30 and 11:00 p.m., except for a brief errand that he ran with Savon Simmons ("Simmons") to buy beer, liquor, chips and cigarettes. Petitioner said that after the party, Simmons drove him to his cousin's house. (T.905-06, 926-27, 949-50). Petitioner said that he discussed the events of that night with his alibi witnesses (Colon, Simmons, and Lauren Lindner ("Linder")) when they visited him in jail. (T.946-47).

Colon described herself as Petitioner's "god-sister" and said that Petitioner and his mother were her closest friends. (T.798-803). Colon testified that she had prior arrests for possession of a weapon and convictions for possession of marijuana and driving while intoxicated. (T.824). Colon admitted that she refused to speak to the police but did provide a statement to a defense investigator. (T.818-19, 831).

Simmons testified that he and Petitioner left Colon's party to buy Hennessey at around 9:15 p.m., returned to the party after running that errand, and then left for good at around 10:00 or 10:30 p.m. (T.836-38, 841-43). Simmons dropped petitioner off at Petitioner's cousin's house. (T.843, 859). Simmons gave a statement to a defense investigator but did not respond to a police officer who was investigating the case. (T.849, 852, 860-61).

Lindner also testified in support of Petitioner's alibi defense. She admitted to a prior arrest for drug-possession. She acknowledged that, prior to trial, she reviewed her anticipated testimony with Petitioner. (T.881, 886-87). Lindner testified that Petitioner arrived at Colon's party on January 24, 2009, at around 5:00 or 6:00 p.m. Lindner recalled that at around 8:30 p.m., Petitioner left briefly to buy a bottle of Hennessey. He departed at 11:00 p.m. and did not return to the party. Lindner stated that Simmons drove her and Colon to visit Petitioner in jail. (T.885).

Colon's daughter, K.J., who refers to Petitioner as her uncle, testified that Petitioner attended a party at her mother's house

the night before he was arrested for the parole violation. She recalled that Petitioner left the party at 11:00 p.m., but she could not remember at what time any of the other guests left. (T.890-95, 898). K.J. testified that she discussed her testimony with her mother, who forbade her from talking to the police. (T.895-97).

### C. Jury Verdict and Sentence

On August 31, 2010, the jury returned a verdict finding Petitioner guilty of all charges submitted to it. (T.1097-99). Prior to sentencing, new counsel was substituted for trial counsel, at Petitioner's request. On October 28, 2010, the trial judge sentenced Petitioner to concurrent determinate terms of 20 years' imprisonment on each conviction, to be followed by 5 years of post-release supervision on each conviction.

## II. Post-Conviction Proceedings in State Court

Represented by new counsel, Petitioner pursued a direct appeal of his conviction, which was unanimously affirmed. See People v. Scott, 93 A.D.3d 1193 (4th Dep't), lv. denied, 19 N.Y.3d 967, recons. denied, 19 N.Y.3d (1001) (2012).

In January of 2013, Petitioner filed a pro se application for a writ of error coram nobis challenging appellate counsel's ineffectiveness, which was summarily denied. People v. Scott, 104 A.D.3d 1261 (4th Dep't), rearg. denied, 107 A.D.3d 1502 (4th Dep't 2013), lv. to appeal rearg. denied, 22 N.Y.3d 1159 (2014), lv.

denied, __ N.E.3d ___ (Mar. 25, 2014), recons. denied, 23 N.Y.3d 1025, recons. denied, __ N.E.3d ___ (June 24, 2014). In May of 2014, Petitioner filed an unsuccessful pro se motion in the trial court challenging the orders of protection issued at the sentencing hearing. In August of 2014, again acting pro se, Petitioner filed a motion in the trial court pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 to vacate his conviction, which was denied on October 30, 2014 (SR.1093-96). Petitioner's motion to reargue and to renew was denied on February 27, 2015. (SR.1099-1100). The Fourth Department denied leave to appeal, and reargument of that denial. (SR.1100-21).

## III. The Habeas Proceeding

In his timely petition for a writ of habeas corpus, Petitioner asserts that (1) he is actually innocent; (2) trial and appellate counsel were ineffective; (3) the evidence was legally insufficient; (4) his conviction was obtained through the use of a suggestive identification procedure; (5) he was subjected to an unlawful search and seizure; (6) he was deprived of his right to present a defense; (7) the jury was unconstitutionally selected; (8) the police and prosecution engaged in misconduct; (9) his conviction rested on unreliable scientific evidence; and (10) the sentence was harsh and excessive and discriminatory. Petitioner also has moved for the appointment of counsel. Respondent answered the petition, and Petitioner filed a reply brief and a traverse.

For the reasons discussed below, the request for a writ of habeas corpus is denied, as is the request for appointment of counsel.

**DISCUSSION**

I.   **The Petition**

A.   **Ground One Is Not Cognizable on Federal Habeas Review.**

For his first claim (see Pet. at 7-10), Petitioner asserts that he is actually innocent of the charges against him. Respondent argues that this claim is not cognizable on federal habeas review and is, in any event, without merit.

The Supreme Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." McQuiggin v. Perkins, 133 S. Ct. 1924, 1931 (2013) (citing Herrera v. Collins, 506 U.S. 390, 404-05 (1993)). Indeed, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Id. (citation omitted). The Supreme Court explained that "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." Herrera, 506 U.S. at 400 (citations omitted). The Supreme Court's habeas jurisprudence "makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but

instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Id. at 404.

Based on the foregoing Supreme Court precedent, Petitioner cannot obtain habeas relief on his freestanding actual innocence claim. See, e.g., Ortega v. Duncan, 333 F.3d 102, 108 (2d Cir. 2003) (stating that in order for habeas relief to issue on a newly discovered evidence claim, "a due process violation must have occurred at Ortega's trial") (citing Herrera, 506 U.S. at 400); Castellanos v. Kirkpatrick, No. 10-CV-5075(MKB), 2015 WL 7312908, at *8 (E.D.N.Y. Nov. 18, 2015) (dismissing § 2254 petitioner's actual innocence claim as "not cognizable on habeas review") (citation omitted).

However, because several of Petitioner's grounds for relief are procedurally defaulted, see infra, the Court will consider whether his actual innocence claim can serve as a "gateway" to federal habeas review for these barred claims. See McQuiggin, 569 U.S. at 386 ("hold[ing] that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations") (citing Schlup v. Delo, 513 U.S. 298, 329 (1995); other citation omitted). "'[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" Id.

-14-

(quoting Schlup, 513 U.S. at 329; citation omitted). Thus, "tenable actual-innocence gateway pleas are rare." Id. "To be credible," a claim of actual innocence must be supported by "new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." Schlup, 513 U.S. at 324. Importantly, "'actual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998) (citation omitted).

Here, Petitioner asserts that he has "compelling newly discovered scientific evidence in the form of an affidavit from Kenneth Moses[,]" a forensic fire investigator, stating that "the purple ninhydrin stains on the matchbook (recovered from crimescene) are where bodily fluid amino acids reacted with the chemical, and are inconsistent with being from fingerprints . . . ." (Pet. at 7 (citing Exhibit ("Ex.") A, Affidavit of Kenneth R. Moses ("Moses Aff."))). According to Petitioner, this proves that the DNA obtained from the matchbook was not "touch DNA" as described by the prosecution's DNA expert but was instead derived some type of bodily fluid planted by law enforcement. As discussed below, the Court finds that Petitioner does not have a colarable "gateway" claim of actual innocence.

In 2014, Petitioner retained Moses, the Director of Forensic Identification Services, an independent crime laboratory, to review the procedures employed to test the recovered matchbook for

fingerprints. (See id. at 6-7, Ex. A). Specifically, Petitioner asked Moses to provide an opinion as to "whether or not the stain on the matchbook is consistent with saliva that might have been improperly transferred to that surface." (Moses Aff., ¶ 7). Based on his examination, Moses determined that the "apparent stain on the matchbook" was "not consistent" with being from a fingerprint because of its "lack of ridge detail and its overall shape that is not similar to the shape of a finger. It appears that the stain reacted with Ninhydrin and therefore *could possibly* be from a bodily fluid." (Moses Aff., ¶ 9; emphasis supplied). Petitioner argues that this establishes his theory that Det. Dudek "artificially deposited" some of Petitioner's "bodily fluid" (presumably, some saliva from the buccal swab) on the matchbook in order to inculpate him. (Pet. at 8-9). Ultimately, however, Moses was "*unable to resolve* [Petitioner's] concerns." (Id. (emphasis supplied)). Thus, contrary to Petitioner's assertion, Moses did *not* state that the ninhydrin stains on the matchbook indicated "where bodily fluid amino acids reacted with the chemical." Rather, that is Petitioner's own self-serving interpretation, which is unsupported by Moses' report. Petitioner has not established that Moses' report is new, reliable, exculpatory scientific evidence.

Petitioner also argues that his factual innocence is supported by a statement from Steven's 14-year-old neighbor, Ashley Hale ("Hale"), who told police that on the night of the fire, she was

walking her dog "in her driveway at 8 Elm Street, when she heard a noise" and then saw "a tall individual[,] possibly a white male wearing a tan coat, dark[-]colored winter hat and work boots run from the area of the noise north on Elm St." (SR.884, 917). Hale did not provide the police with a definitive description of the race of the man she saw running on Elm Street; she explained that she thought that he "might" be white because, from behind, she thought that she saw "white in the neck area." (SR.914). Hale's statement cannot form the basis of an actual innocence claim because it is not "new." Indeed, the record establishes that Petitioner was aware of her statement at the time of the trial, and subpoenaed her to testify as a defense witness in support of his third-party culpability theory that Luczak's estranged husband, a veteran with PTSD who had committed multiple acts of domestic violence against her, was the arsonist. (T.321, 771).[5]

In addition, the exculpatory value of Hale's statement is far from clear. As noted above, the young woman was unsure about the race of the man she saw running. The record also indicates that Luczak's estranged husband was somewhat less than average height

---

[5]
The trial court denied Petitioner's request to present evidence supporting his third-party culpability theory on the basis that he had not demonstrated a sufficient link between the arson at issue and Luczak's husband. (See T.318-21). On appeal, the Fourth Department found that this was not an abuse of discretion; given lack of evidence supporting the theory that Luczak's husband might have had a motive to harm one of the residents of the apartment building where the fire occurred, such evidence was irrelevant and was likely to cause undue prejudice and confusion with respect to evidence presented to the jury. Scott, 93 A.D.3d at 1195 (citations omitted).

for a man (5'7"), while Petitioner is quite tall (6'9"). (SR.27). And, Petitioner testified that it was possible that he was wearing a tan coat on the night of the fire. (T.959). Since Hale's statement leaves open the possibility that Petitioner was actually the "tall" man she saw running on the night of the fire, it does not persuasively show his factual innocence.

Even considering the Moses report and Hale's statement cumulatively, they do not augment the defense case such that "it is more likely than not that no reasonable juror would have convicted [Petitioner] in light of the new evidence." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup v. Delo, 513 U.S. at 327). Therefore, Petitioner fails to satisfy the standard for a "gateway" claim of actual innocence.

**B.    Ground Two Partially Fails to State Colorable Habeas Claims and Partially Lacks Merit.**

As Ground Two of the Petition, Petitioner itemizes 44 purported errors by trial counsel, sentencing counsel, and appellate counsel. "It is well-established that '[c]onclusory allegations . . . not supported by a statement of specific facts do not warrant habeas relief.'" Webb v. Griffin, No. 10-CV-0585 MAT, 2011 WL 3738974, at *8 (W.D.N.Y. Aug. 24, 2011) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir.) (citation omitted), cert. denied, 513 U.S. 935 (1994); citation omitted). The alleged errors that form the basis of Ground Two are presented essentially as a

"laundry list," without any factual amplification or supporting legal argument.

In his Memorandum of Law in Support of Habeas Corpus Petition and Reply to Respondent's Answer ("Reply"), Petitioner fleshes out portions of his ineffective assistance claim. (See Reply at 1-18). The arguments raised therein pertain to the allegations numbered 2, 6, 8, 12, 13, 22, 34, 37, 39, 41, and 44 in the Petition. The Court will consider these allegations as they have been amplified with additional factual explanation and legal argument. However, the Court dismisses, as too conclusory to state viable habeas claims, Ground Two's allegations numbered 1, 3-5, 7, 9-11, 14-19, 20-21, 23-33, 35-36, 38, 40, and 42-43. See Jones v. Hollins, 884 F. Supp. 758, 766 (W.D.N.Y.) ("[W]ithout providing specific citations to the record, . . . [petitioner's] conclusory allegation, made without any factual or case law support, is insufficient to overcome the strong presumption of reasonable assistance."), aff'd, 89 F.3d 826 (2d Cir. 1995); Matura v. United States, 875 F. Supp. 235, 237-38 (S.D.N.Y. 1995) ("[B]ecause [petitioner's] claim is merely a conclusory allegation, petitioner has failed to establish that his counsel's performance was deficient. Petitioner's bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably."); other citations omitted).

### 1.  Applicable Legal Standard

The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to the assistance of counsel. U.S. Const., amend. VI. A lawyer's representation is constitutionally deficient where it (1) falls "below an objective standard of reasonableness;" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," id. at 689, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." id. To fulfill the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result. Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quotation omitted).

Strickland's two-pronged standard also applies to appellate counsel. Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (citation omitted), cert. denied, 513 U.S. 820 (1994). It is not sufficient

for a petitioner to show that appellate counsel omitted a colorable argument. <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983). Rather, he must demonstrate that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." <u>Clark v. Stinson</u>, 214 F.3d 315, 322 (2d Cir. 2000).

### 2. Allegations Against Trial Counsel (Nos. 2, 6, 8, 12-13, 22, 37, 39 & 41)

Allegation numbers 2, 6, and 12 pertain to trial counsel's alleged failure to appropriately challenge the prosecution's forensic evidence. Petitioner argues that trial counsel erroneously relied on Petitioner, rather an a forensic expert, to challenge the forensic evidence. However, this assertion is belied by the record, which indicates that defense counsel consulted with a forensic expert, Dr. Julie Heinig; however, counsel ultimately decided not to call her as a witness.

Relatedly, Petitioner asserts that trial counsel was ineffective for not requesting a "'<u>Frye/Daubert</u>' hearing on LCN (low template) DNA." Even assuming that this was an error, Petitioner has not demonstrated how this omission prejudiced his defense, and therefore fails to establish ineffective assistance. <u>See</u>, <u>e.g.</u>, <u>Maddox v. Lord</u>, 818 F.2d 1058, 1062 (2d Cir. 1987) ("[P]etitioner contends that her trial counsel unreasonably failed to investigate the prosecution's forensic evidence. Even assuming the failure to be unreasonable, petitioner has not met the second

prong of the <u>Strickland</u> test because she has not shown that such alleged failure prejudiced her defense. Although she offers an affidavit from an expert who will testify as to the path and trajectory of the bullets fired from the rifle, there is no indication that this evidence would be in any way exculpatory.").

In addition, Petitioner faults counsel for failing "to consult with or obtain fire cause and origin experts," as Petitioner did in 2014. As Respondent argues, the proposed experts' conclusion that the BFD's investigation was flawed is based on a critique of relatively insignificant shortcomings, such as the failure to adequately coordinate their team investigative approach, to secure DNA samples from all residents of 12 Elm Street, to try to match Petitioner's shoes with footprints in the snow, and to identify the source of the Clorox bottle and the matchbook found in the cellar.

In adjudicating this fire-expert claim on the merits in connection with Petitioner's C.P.L. § 440.10 motion, the trial judge correctly found that the report (SR.819-30) simply "challenge[d] the quality of the forensic evidence without offering a plausible fact-based alternative scenario for either accidental ignition or third-party involvement (as previously rejected by this Court and the Appellate Division)." (SR.1095). Moreover, as the trial court found, the report "constitutes mere impeachment material[,] which, if offered by the defense at trial would not have disclosed information of such significantly greater impeachment value as to create a reasonable possibility of a

different verdict." (SR.1095). Thus, even if Petitioner could show that this omission constituted deficient performance, he has failed to show that it detrimentally affected the outcome of his trial. Furthermore, as the trial court found, since trial counsel elected to pursue an alibi defense, "there existed legitimate reasons for trial counsel to restrict his challenge to the forensic evidence regarding the cause and origin of the fire to cross-examination." (SR.1095) (citation omitted). The failure to call a forensic expert to address the "how and why" of the arson did not prevent trial counsel from actually presenting an alternative theory of the case to the jury, because Petitioner mounted an alibi defense, challenging the prosecution's identification of "who" the arsonist was. Furthermore, calling a forensic expert on behalf of the defense was not without risk, including the exposure of the expert to cross-examination. Here, defense counsel executed a vigorous and effective cross-examination of the prosecution's fire experts, and succeeded in presenting the essential points of the defense without exposing a defense expert to cross-examination. See, e.g., Morency v. Annucci, No. 14-CV-672(DLI)(ST), 2017 WL 4417718, at *12-13 (E.D.N.Y. Mar. 20, 2017), report and recommendation adopted, No. 14-CV-672 (DLI) (ST), 2017 WL 4417647 (E.D.N.Y. Sept. 30, 2017).

In allegation number 8, Petitioner asserts that trial counsel was ineffective in failing to have all evidence samples independently retested for the presence of accelerants, notwithstanding that, according to Petitioner, it was common

knowledge that the New York State Police forensic laboratory was being investigated for purportedly "dry-labbing (faking results)." This allegation relies on pure speculation and, as such, does not suffice to show deficient performance by counsel, or the reasonable probability of a different result. See Johnson v. Artus, No. 07CIV59005(SAS)(FM), 2009 WL 763897, at *11 (S.D.N.Y. Feb. 20, 2009) ("[The petitioner's] mere conjecture that [trial counsel] could have secured such testimony [corroborating claim of police misconduct] had he only investigated further plainly is insufficient to warrant habeas relief.") (citations and footnote omitted), report and recommendation adopted, No. 07 CIV. 5905 SAS FM, 2009 WL 1505177 (S.D.N.Y. May 28, 2009).

In allegation number 13, Petitioner assails trial counsel for failing to "present readily available exculpatory ninhydrin findings and testimony from experts such as Mr. Moses that contradict State's 'touch DNA' theory and support defense that DNA was planted." (Pet. at 12) (citation omitted). Petitioner vastly overstates the probative value of the Moses' report which, as discussed supra, neither proved that DNA was "planted" on any of the items of physical evidence nor exculpated Petitioner.

In allegation number 22, Petitioner asserts that trial counsel was ineffective in failing to request missing witness charges with regard to Hale; John Egan, who performed the fingerprint analysis; Det. Sgt. Corona; and Capt. Steinbrenner. With regard to Hale, Petitioner's protest is nonsensical because he also argues,

contradictorily, that trial counsel's failure to call Hale as a defense witness was ineffective. With regard to the remaining three individuals, Petitioner offers nothing but speculation as to how their testimony would have helped the defense, which is insufficient to show that counsel was ineffective. See, e.g., Eisemann v. Herbert, 401 F.3d 102, 108 (2d Cir. 2005) (ineffective assistance claim based on failure to call a witness lacked merit where "there is nothing in the record that provides the slightest indication as to what [the witness] would have said if called or even that he would have said anything at all" and it was "speculation to suggest that his testimony would have been exculpatory") (citation omitted).

In allegation number 37, Petitioner faults trial counsel for having "elicited highly prejudicial testimony about a blue car with two black males [in it]" during Steven's cross-examination, because the dispositive issue was identity, and Petitioner is black. Petitioner, admits however, that there was no proof that any blue car was connected to this crime; nor does he own a blue car. Steven did not recognize either of the individuals in the vehicle, one of whom was light skinned and one of whom was dark skinned. (T.352-55). Steven testified that he did not see it stop in front of the house or alongside the house, or pull into the driveway. The Court cannot discern how any of this testimony was prejudicial given that it did not link Petitioner to the crime.

In allegation number 39, Petition asserts that trial counsel had "divided loyalty" due to his "prior familiarity" with the arson victim. Petitioner asserts that trial counsel falsely informed him that his state habeas corpus petition for bail could not be appealed, because counsel was concerned about the safety of the victim's daughter, April. Petitioner has not come close to showing that trial counsel labored under an actual conflict of interest. The Second Circuit has cautioned that "it is not enough in determining the existence of an actual conflict of interest merely to assess the attorney's state of mind"; rather, there must exist some "objective basis for the claim." <u>Strouse v. Leonardo</u>, 928 F.2d 548, 553 (2d Cir. 1991). Here, the objective basis is clearly lacking. <u>Compare</u> <u>with</u> <u>Moseley v. Scully</u>, 908 F. Supp. 1120, 1139 (E.D.N.Y. 1995) (finding no "objective basis" that habeas petitioner's lawyer was affected by a conflict of interest due to alleged emotional ties to murder victim, who was a former client of the lawyer, despite lawyer's own statement during the sentencing phase of the trial that he "didn't try this case . . . objectively, calmly, just as a lawyer defending a client [should]" which "reek[ed] of an actual conflict of interest"; district court found that lawyer's "ephemeral representation of [the victim] did not create the type of relationship likely to bias him towards his former client over his current client any more than any lawyer would feel compassion and sympathy towards a savagely murdered victim"), <u>aff'd</u>, 104 F.3d 356 (2d Cir. 1996). Even if there was a

conflict of interest, Petitioner still has not shown entitlement to habeas relief, because Petitioner has not established that his attorney's personal interests diverged from his "with respect to a material factual or legal issue or to a course of action." LoCascio v. United States, 395 F.3d 51, 56 (2d Cir. 2005) (quotation omitted).

### 2. Allegations Against Sentencing Counsel (Nos. 40-41)

Petitioner contends that sentencing counsel, who was substituted for trial counsel, erred by failing to investigate Petitioner's claim of juror misconduct, and then lied at sentencing by claiming that he had investigated it and found it nonmeritorious. The juror misconduct claim is based on conversations between an *alternate* juror, Dorothy Hall ("Hall"), and her grand-daughter, Melania London ("London"), who worked as an officer at the jail where Petitioner was being held and who was not involved in Petitioner's trial. However, these two individuals were not members of the deliberating jury. Further, the record indicates that prior to deliberations, the trial court placed the three alternate jurors, including Hall, "with each other but separate from the other jurors." (T.1086). Petitioner was not prejudiced because the claim was without merit.

Petitioner also faults sentencing counsel for failing to challenge the orders of protection in favor of April and Sachs because they were not victims as defined statutorily. This is

unsupported by the record, which indicates that sentencing counsel did raise that objection. (SR.13-15).

### 3.    Allegations Against Appellate Counsel (No. 44)

In allegation number 44, Petitioner argues that appellate counsel should have made a more compelling presentation of his Fourth Amendment argument. Petitioner notes that in the leave letter, appellate counsel wrote that the principal issue was whether the Parole Division "had the legal authority to transfer the saliva samples and cellular phones" to the BPD; the Fourth Department held that the Parole Division "had the authority to conduct the warrantless search, that is not the issue that [appellate counsel] raised in [his] brief. Rather, the issue is whether it had legal authority to transfer the fruit of its warrantless search to the Batavia Police Department." Appellate counsel's argument about the alleged lack of legal authority to transfer the buccal swab was based on the theory that the Parole Division "was acting as 'a conduit of police activity. . . .'" (SR.25).    The Fourth Department concluded that based on the evidence presented at the suppression hearing, it "cannot conclude that the trial court erred, as a matter of law, in concluding that the search of the defendant by the parole officers, with police assistance, was in furtherance of parole purposes and related to their duty as parole officers[.]" People v. Scott, 93 A.D.3d at 1194 (internal quotations, ellipses, alterations omitted; citations

omitted). By disposing of Petitioner's argument regarding the legality of the search and seizure, the Fourth Department implicitly rejected appellate counsel's contention that the Parole Division did not have the legal authority to transfer the fruits of its search to the BPD.

Petitioner, for his part, faults the Fourth Department for purportedly "evad[ing]" a different issue of law, namely, "that a DNA test is a separate search which exceeds the scope of a drug test and requires a warrant pursuant to C.P.L. § 240.40-2(b)(5)." In his brief, appellate counsel argued in passing that discovery of Petitioner's DNA was not necessarily "inevitable" because there was no way of knowing how the trial court would have ruled on a C.P.L. § 240.40-2(b)(5) motion. Even assuming that this is a colorable argument, Petitioner has not demonstrated a reasonable probability of a more favorable result, given that a sample of Petitioner's DNA already was on file with a statewide database pursuant to New York's law requiring convicted felons to provide DNA samples.

### C.  Ground Three Does Not Warrant Habeas Relief Under 28 U.S.C. § 2254(d)(1)

On direct appeal, Petitioner argued, as he does here, that the evidence against him was insufficient because the DNA evidence was unreliable, and, therefore, the prosecution failed to prove his identity as the arsonist.  (SR.33-37).  The Fourth Department

rejected Petitioner's legal insufficiency claim, and further found that the verdict was not against the weight of the evidence.

The "relevant question" for a habeas court assessing the legal sufficiency of the evidence supporting a petitioner's conviction, "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326.

Here, the sole issue is whether the prosecution established, beyond a reasonable doubt, the identity of the individual who committed the crimes charged. See N.Y. Crim. Proc. Law. § 70.20 ("No conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the Defendant's commission thereof."). The Second Circuit has explained that "there is no rule of law that requires identity to be established by an eyewitness[;]" rather, "[i]dentity can be inferred through circumstantial evidence." United States v. Kwong, 14 F.3d 189, 193 (2d Cir. 1994).

Appellate counsel's legal insufficiency argument focused on the lack of direct evidence linking Petitioner to the crime, which in turn was based on alleged flaws in the forensic testing methodology, cross-contamination of evidence items, and a shoddy investigation of the crime scene by fire department and police personnel. (SR.33-34). These arguments, in turn, attacked the credibility of the fire department witnesses, the police witnesses, and the forensic experts who testified at trial. However, it is well settled that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; [the reviewing court] defer[s] to the jury's assessments of both of these issues." Maldonado v. Scully, 86 F.3d 32, 36 (2d Cir. 1996) (citations omitted). Here, trial counsel thoroughly challenged the veracity, credentials, and competence of the prosecution's police, fire, and forensic witnesses, as well as the substance of their findings in his comments to the jury. The jurors, however, rejected these credibility arguments, and this Court cannot revisit their factual determinations. See id.

With regard to the circumstantial evidence related to identity, Petitioner argued that even assuming he made threats to April and Steven, those threats do not directly link him to the crime because neither April nor Steven testified to a specific statement of what he was going to do, and that both witnesses were not credible. Again, the credibility issues presented in the testimony of April and Steven were exclusively within the jury's

province to resolve. See id. Petitioner ignores the testimony from April's cousin, who identified himself as a friend of Petitioner, and who appeared reluctant to be testifying. Sachs related that Petitioner made statements to him indicating his intention to "get rid of" April and Steven, while promising to spare Sachs and his immediate family from harm. (T.294-96, 304). Petitioner cannot dispute that such evidence is generally admissible for purposes of establishing intent, motive and identity. E.g., People v. Bierenbaum, 748 N.Y.S.2d 563, 587 (1st Dep't 2002). Moreover, Petitioner cites no authority regarding the degree of specificity that must be present for prior threats to be relevant and probative as to an accused's intent, motive and identity. It is true that evidence of prior threats and assaults sometimes "manifests . . . a general propensity to act aggressively against other people[,]" id., and is not proper. Here, however, the proof clearly evinces Petitioner's intent to focus his aggression on one person and her close family members. See id. The victim in this case—Steven—was one of the individuals specifically identified by Petitioner as someone he intended to "get rid of." The crime occurred at Steven's home, on the same day that Petitioner told him that he did not want Petitioner to "come out there."

With regard to Petitioner's alibi, this also was a weight-of-the-evidence question entrusted to the jury. All of the alibi witnesses, who were very close of friends of Petitioner, admitted to visiting him since the night of the fire; they also spoke to

each other about the case. Colon and Simmons, in particular, were inconsistent when questioned about when they discussed the case with Petitioner and the extent of what they discussed. On the present record, the jury cannot be said to have acted arbitrarily in discounting these witnesses' stories.

Sachs testified that after the fire, Petitioner approached him and said he "needed the money [Sachs] owed him soon because he was going to jail. . . ." (T.297). The jury was entitled to consider this as evidence of consciousness of guilt. See, e.g., People v. McPhillips, 21 N.Y.S.3d 134, 135 (2d Dep't 2015) (statement to victim by defendant, "'I'm not going back to prison' . . . constituted an implicit acknowledgment by the defendant that he had engaged in conduct that would result in him 'going back to prison'" and thus the "statement contained an 'implied admission of guilt'") (citations omitted). It also could be viewed as circumstantial evidence of motive, intent, and identity. See People v. Brumfield, 654 N.Y.S.2d 74, 74 (4th Dep't 1997) (defendant's comment in statement to police that "[he] didn't want to go back to jail because [he] had just got out" not required to be redacted as it was admissible to show defendant's motive and intent) (citations omitted).

After reviewing the record, the Court agrees that the Fourth Department correctly applied the Jackson standard in denying Petitioner's legal insufficiency claim. As that court concluded, "there is a valid line of reasoning and permissible inferences to

support the jury's finding that [Petitioner] committed the crimes of which he was convicted based on the evidence presented at trial[.]" <u>Scott</u>, 93 A.D.3d at 1194 (citations and quotations omitted).

### D. Grounds Four and Six Are Unexhausted But Must Be Deemed Exhausted and Procedurally Defaulted

#### 1. Ground Four: Unconstitutional Identification Procedure

As Ground Four of the Petition, Petitioner claims that he was subjected to "an unduly suggestive and irreparable misidentification procedure." (Pet. at 16-17). Petitioner concedes that he never raised this claim in state court. (<u>See</u> <u>id.</u> at 17). This claim is unexhausted he has never fairly presented it in Federal constitutional terms to the State courts in the course of completing one round of the State's established appellate review process. <u>See</u>, <u>e.g.</u>, <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004). However, the claim must be deemed exhausted because Petitioner no longer has available remedies in state court. <u>See</u>, <u>e.g.</u>, <u>Bossett v. Walker</u>, 41 F.3d 825, 829 (2d Cir. 1994) (deeming claims exhausted where it "would . . . be fruitless to require [the petitioners] to pursue these claims in state court"). First, Petitioner has already completed his direct appeal. By statute, New York law used to specifically provide for only a single application for direct review. <u>Spence v. Sup't, Great Meadow Corr. Fac.</u>, 219 F.3d 162, 170 (2d Cir. 2000) (relying on former New York Rules for the Court of

Appeals ("N.Y. R. Ct.") § 500.10(a) (discussing leave applications for criminal appeals)). N.Y. R. Ct. § 500.10 has since been amended, and criminal leave applications are now addressed in N.Y. R. Ct. § 500.20. Although § 500.20 "does not specifically state that there may be only one application for appeal, see N.Y. R. Ct. § 500.20, such a restriction may be inferred," since "[b]oth Rule 500.20(d) and CPL § 460.10(5) provide a 30-day window for any such application to be filed; this time limit would be meaningless were multiple applications permitted." Colon v. Connell, No. 07 Civ. 7169(BSJ)(JCF), 2009 WL 2002036, at *6 n. 4 (S.D.N.Y. July 9, 2009). In addition, N.Y. R. Ct. § 500.20(a)(2) provides that the leave letter must indicate that "that no application for the same relief has been addressed to a justice of the Appellate Division, as only one application is available[.]" N.Y. R.CT. § 500.20(a)(2).

The only other way for Petitioner to exhaust this habeas claim would be to file a motion to vacate the judgment pursuant to C.P.L. § 440.10. Because the claim is based on matters of record and could have been raised on direct appeal, denial of such a motion is statutorily mandated. See N.Y. Crim. Proc. Law § 440.10(2)(c).

The procedural rules that foreclose Petitioner's return to state court also render his suggestive identification procedure claim procedurally defaulted. See Bossett, 41 F.3d at 829. "Federal courts may address the merits of a claim that was procedurally defaulted in state court only upon a showing of cause for the default and prejudice to the petitioner." Id. (citing Wainwright v.

_Sykes_, 433 U.S. 72, 87 (1977)). "Cause may be demonstrated with 'a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that "some interference by state officials" made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel.'" _Id._ (quoting _Murray v. Carrier_, 477 U.S. 478, 488 (1986) (citations omitted in original; ellipses and brackets in original). Although Petitioner does raise a slew of ineffective assistance of trial and appellate counsel claims, none of them are meritorious, as discussed _supra_. Therefore, they cannot serve as "cause." _See_, _e.g._, _Bloomer v. United States_, 162 F.3d 187, 191 n. 1 (2d Cir. 1998) ("Ineffective assistance will constitute cause when it rises to a constitutional violation of a petitioner's Sixth Amendment right to have the effective assistance of counsel for his defense.") (citing _Coleman v. Thompson_, 501 U.S. 722, 755 (1991)).

Petitioner's inability to show "cause" obviates the need for the Court to consider whether "prejudice" exists. _See_ _Stepney v. Lopes_, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [the petitioner] showed prejudice.").

As alternative to showing cause and prejudice, "[a] habeas petitioner may bypass the independent and adequate state ground bar

by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, i.e., that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup, 513 U.S. at 321; other citation omitted). As discussed supra, Petitioner has not established a viable "gateway" claim of actual innocence. Therefore, he cannot rely on the fundamental miscarriage of justice exception. His suggestive identification claim accordingly is dismissed as subject to an unexcused procedural default.

### 2. Ground Six: Denial of Right to Present a Defense

Respondent argues that Petitioner's claim concerning the trial court's denial of permission to present evidence in support of a third-party culpability theory is unexhausted because Petitioner did not present this evidentiary claim to the state courts in terms of a violation of his constitutional right to present a defense. For purposes of exhaustion, "the petitioner must have placed before the state court essentially the same legal doctrine he asserts in his federal petition." Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191 (2d Cir. 1982) (en banc) (citations omitted). A petitioner may "fairly present the substance of a federal constitutional claim to the state court without citing '"book and verse on the federal constitution[,]"'" id. (quotations omitted), such as "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in

like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Id. at 194.

In his brief, Petitioner cited only to New York state cases that did not employ any federal constitutional analyses or refer even generally to the constitutional right to present a defense. Nor did the appellate brief assert the claim in terms so particular to call to mind a specific right protected by the Constitution, or allege a pattern of facts that is well within the mainstream of constitutional litigation. Therefore, the Court finds that Petitioner failed to fairly present his constitutional claim to the state courts, "because his appellate brief did not alert the state courts that a Federal constitutional claim was at issue. . . ." Young v. Conway, 761 F. Supp.2d 59, 78 (W.D.N.Y. 2011) (citing Day, 696 F.2d at 194; other citation omitted), aff'd, 698 F.3d 69 (2d Cir. 2012).

Petitioner's claim alleging the denial of the right to present a defense must be deemed exhausted because Petitioner no longer has remedies available in New York state courts. Petitioner has already used his direct appeal, and collateral review by means of another C.P.L. § 440.10 would be subject to mandatory dismissal under C.P.L. § 440.10(2)(c). See Young, 761 F. Supp.2d at 79. However, the same procedural bars that result in the "constructive exhaustion" of the claim also creates a procedural default. See,

e.g., Bossett, 41 F.3d at 828-29 (citations omitted). For the reasons discussed supra, Petitioner cannot show cause; this is fatal because cause and prejudice both must be established. See Stepney, 760 F.2d at 45. Likewise, as discussed supra, he does not have a viable actual innocence claim and cannot demonstrate a fundamental miscarriage of justice. Ground Six accordingly is dismissed as subject to an unexcused procedural default.

### E. Ground Five Is Barred Because Petitioner Had a Full and Fair Litigation Opportunity in State Court

Petitioner argues that the BPD unlawfully obtained a sample of his DNA, via a buccal swabbing performed by P.O. Van Schaik, in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. (See Pet. at Ground Five, pp. 18-20). Respondent argues that this claim barred by the doctrine articulated in Stone v. Powell, 428 U.S. 465 (1976), that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494 (footnotes omitted). The Second Circuit has interpreted Stone's holding as permitting federal habeas review of Fourth Amendment claims only in limited circumstances, namely, where "the state provides no corrective procedures at all to redress Fourth Amendment violations," Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc) (citations omitted), cert.

<u>denied</u>, 434 U.S. 1038 (1978), or "an unconscionable breakdown in that process" "preclude[s] [the defendant] from utilizing it . . . ." <u>Id.</u>

Here, prior to trial, Petitioner moved to suppress the buccal swab based primarily on the argument that upon the theory that the parole officer was improperly acting as an agent of the police when the evidence was seized. A hearing was conducted on February 26, 2010, after which the trial court determined that no constitutional violation occurred. Through appellate counsel, Petitioner pressed his Fourth Amendment claim on direct appeal. The appellate court found that the parole officers' warrantless search was constitutional because it was rationally and reasonably related to the performance of their duties as parole officers. The record reveals that New York State's corrective process[6] not only was available to, but was actually utilized by, Petitioner. Moreover, there is no indication that there was "an unconscionable breakdown" in New York State's corrective process; it is well established that "a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." <u>Capellan</u>, 975 F.2d at 72. Accordingly, the

---

[6]
   As the Second Circuit has noted, "the 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 <u>et</u> <u>seq.</u> (McKinney 1984 & Supp. 1988), as being facially adequate.'" <u>Capellan v. Riley</u>, 975 F.2d 67, 70 & n. 1 (2d Cir. 1992) (quoting <u>Holmes v. Scully</u>, 706 F. Supp. 195, 201 (E.D.N.Y. 1989); citation omitted).

Court finds that Petitioner's Fourth Amendment claim is barred from federal habeas review. See id.

### F. Grounds Seven and Eight Are Too Conclusory and Speculative to State Colorable Claims

#### 1. Ground Seven: Racial Discrimination in Jury Selection

Under the heading for Ground Seven in the Petition, Petitioner alleges that the jury panel lacked ethnic diversity, and that the prosecutor exercised a peremptory challenge in a discriminatory manner. As Respondent notes, Petitioner has set forth no facts in support of these claims, which warrants their summary dismissal. Webb, 2011 WL 3738974, at *8 (citing, inter alia, United States v. Fisher, 38 F.3d 1144, 1147 (10th Cir. 1994) (holding that the court "is not required to fashion [petitioner's] arguments for him where his allegations are merely conclusory in nature and without supporting factual averments")).

#### 2. Ground Eight: Prosecutorial Misconduct

Under the heading for Ground Eight in the Petition, Petitioner asserts a litany of alleged wrongdoings by the Genesee County District Attorney's Office and the BPD, grouped by Respondent into the following categories: (1) planting DNA evidence; (2) suborning perjury from the police witnesses and the Crandalls; (3) presenting "knowingly misleading DNA testimony;" (4) withholding information on third-party culpability and Steven Crandall's prior informant status; and (5) misstating evidence in summation. (See Pet. at 22).

Federal courts "have no obligation to entertain pure speculation and conjecture." Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011). Moreover, "[f]ederal district courts cannot grant habeas relief based upon unsubstantiated surmise, opinion or speculation." Mills v. Lempke, No. 11-CV-0440 MAT, 2013 WL 435477, at *23 (W.D.N.Y. Feb. 4, 2013) (citing Wood v. Bartholomew, 516 U.S. 1, 8 (1995) (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support"); other citations omitted). Petitioner's claims of pervasive misconduct by multiple law enforcement agencies, amounting to no less than a conspiracy to unjustly incarcerate him, is based upon rank speculation with no record support. Accordingly, they cannot provide a basis for habeas relief. E.g., Mills v. Lempke, 2013 WL 435477, at *23 (collecting cases); see also Panezo v. Portuondo, No. 02-CV-1522(JBW), 2003 WL 23198781, at *15 (E.D.N.Y. Nov. 6, 2003) (finding that habeas claim "based on such rank speculation" was "frivolous").

### G. Ground Nine Is Procedurally Defaulted Under the Adequate and Independent State Ground Doctrine

On direct appeal, the Fourth Department held that "[i]nasmuch 'as defense counsel never specifically objected to the DNA testimony on the grounds he now presses on appeal, namely that [there was an insufficient foundation for the introduction of that evidence due to the testing that was performed], defendant failed to preserve this issue for our review[.]'" Scott, 93 A.D.3d at 1195

(quotation omitted; citing People v. Gray, 86 N.Y.2d 10, 19 (1995) ("[T]he preservation requirement compels that the argument be 'specifically directed' at the alleged error. . . .")). The Fourth Department went on to hold that, in any event, Petitioner's "contentions go to the weight of the evidence, not its admissibility[.]" Id. (citation omitted).

Respondent argues that the Fourth Department's reliance on an adequate and independent state ground, namely, New York's contemporaneous objection rule, forecloses federal habeas review of this claim. See, e.g., Garcia v. Lewis, 188 F.3d 71, 76 (2d Cir. 1999) ("Under th[e] [adequate and independent state ground] doctrine the Supreme Court 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question *and adequate* to support the judgment.'") (quoting Coleman, 501 U.S. at 729; emphases supplied). Here, there is "no question" that the Fourth Department's "explicit invocation of the procedural bar constitutes an 'independent' state ground," Garcia, 188 F.3d at 77 (citing Harris v. Reed, 489 U.S. 255, 263 (1989)), "even though the court spoke to the merits of [Petitioner]'s claim in an alternative holding," id. (citing 489 U.S. at 264 n. 10).

Turning to the "adequacy" element, the Supreme Court has repeatedly held that "'the question of when and how defaults in compliance with state procedural rules can preclude . . .

consideration of a federal question is itself a federal question.'" Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (quotation omitted). A federal habeas court's "responsibility to ensure that the state rule is 'adequate" obligates [it] to examine the basis for and application of state law." Garcia, 188 F.3d at 77 (citations omitted). As a general matter, both the Supreme Court and the Second Circuit have consistently recognized that contemporaneous objection serve legitimate state interests, id. at 78 (citations omitted), such as allowing the state judge "to make the factual determinations necessary for properly deciding the federal constitutional question," and promoting "finality in criminal litigation," Wainwright, 433 U.S. at 88. Time and again, the Second Circuit has "observed and deferred to New York's consistent application of its contemporaneous objection rules." Id. at 79 (collecting cases).

Here, based upon its review of pertinent decisions, this Court concludes that it must defer to the Fourth Department's finding of procedural default because that finding is supported by a "fair or substantial basis," Garcia, 188 F.3d at 78 (collecting cases), in New York state law. Further, the Court finds no basis in the record "for deeming application of New York's contemporaneous objection rule to [Petitioner]'s claim to be 'exorbitant.'" Whitley v. Ercole, 642 F.3d 278, 288 (2d Cir. 2011) (quotation omitted). To the contrary, the Fourth Department's invocation of the contemporaneous rule in the present case was "well within the

parameters of its routine and generally unquestionable application to bar review of unpreserved objections to trial testimony[,]" <u>id.</u>, where the defendant failed to specify, in his objection, the precise ground later raised on appeal. <u>See</u> <u>id.</u> (collecting cases).

As discussed <u>supra</u>, Petitioner cannot avail himself of the fundamental miscarriage of justice exception. Moreover, he has not demonstrated cause for the default, which obviates the need to consider whether prejudice exists. <u>See</u> <u>Stepney</u>, 760 F.2d at 45.

**H.    Ground Ten Is Partially Not Cognizable on Federal Habeas Review and Is Partially Unexhausted But Plainly Meritless**

### 1.    Harsh and Excessive Sentence

Respondent argues that Petitioner's challenge to the length of his sentence, since it is based solely on state law, is not amenable to federal habeas review. <u>See</u>, <u>e.g.</u>, <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992). In his Traverse (Docket No. 15), Petitioner concedes this point. Accordingly, the Court dismisses as non-cognizable Petitioner's claim that the trial judge abused his discretion and imposed an excessive sentence.

### 2.    Racial Prejudice in Sentencing

Petitioner also asserts that the trial court sentenced him "vindictively" based on what Petitioner perceives to be racially discriminatory animus. Respondent argues that this claim is "unexhausted and procedurally barred because Petitioner did not raise it on direct appeal or in his motion to vacate the sentence and provides this Court with no reason for his failure to do so."

(Resp't Mem. at 47). Respondent is correct that the claim is unexhausted, but is incorrect that the claim is procedurally barred. Under New York law a defendant retains the right to collaterally attack the legality of his sentence "[a]t any time after the entry of a judgment" as long as the claim was not "previously determined on the merits upon an appeal." C.P.L. §§ 440.20(1) & (2); see also, e.g., Naranjo v. Filion, No. 02CIV.5449WHPAJP, 2003 WL 1900867, at *8 (S.D.N.Y. Apr. 16, 2003) (collecting cases). Contrary to Respondent's assertion, Petitioner does indeed have state court remedies available in state court insofar as he could assert his discriminatory-sentence claim in federal constitutional terms in a motion to vacate the sentence pursuant to C.P.L. § 440.20. See, e.g., Naranjo, 2003 WL 1900867, at *8 (petitioner's unexhausted excessive sentence and sentencing misinformation claims can be raised in federal constitutional terms in a collateral C.P.L. § 440.20 motion to the extent that they are challenging the legality of his sentence") (citation omitted). Therefore, the claim is not procedurally barred.

Under 28 U.S.C. § 2254(b)(2), the Court has the discretion to deny claims "on the merits, notwithstanding the failure . . . to exhaust. . . ." Although the Supreme Court and the Second Circuit have yet to enunciate a standard for determining when unexhausted claims should be denied on the merits, the Supreme Court in Rhines v. Weber, 544 U.S. 269 (2005), instructed district courts that the stay and abeyance procedure should be used sparingly and only where

the unexhausted claims are not "plainly meritless[.]" Id. at 277. Thus, it follows that if an unexhausted claim is "plainly meritless," it would not be an abuse of discretion to rely on § 2254(b)(2) to dismiss the claim on the merits.

"Mere allegations of judicial bias or prejudice do not state a due process violation." Brown v. Doe, 2 F.3d 1236, 1248 (2d Cir. 1993), cert. denied, 510 U.S. 1125 (1994). The record is devoid of any suggestion that the trial judge harbored racial prejudice against Petitioner, or relied on any other improper basis when he fashioned Petitioner's sentence. Accordingly, the Court finds this claim to be "plainly meritless," and it is dismissed. See, e.g., Naranjo, 2003 WL 1900867, at *13 (dismissing unexhausted sentencing claim where petitioner "offered no evidence of actual vindictiveness in sentencing and, therefore, . . . has not made out a claim of constitutionally impermissible vindictive sentencing").

## II. Miscellaneous Motions

Prisoners have no constitutional right to counsel when bringing collateral attacks upon their convictions. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). Rather, the appointment of counsel is a matter of discretion. Wright v. West, 505 U.S. 277, 293 (1992). In determining whether it should appoint counsel under 28 U.S.C. § 1915(d) for indigents in civil cases, such as petitions for a writ of habeas corpus under 28 U.S.C. § 2254, the court first should "determine whether the indigent's position seems likely to be of substance." Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir.

1997). Petitioner cannot meet this threshold showing, given that the Court has found that none of his claims warrant habeas relief. The Court finds that the interests of justice do not necessitate the appointment of counsel in this case, and Petitioner's motion for the appointment of counsel is denied with prejudice.

Petitioner's Motion to Appoint Counsel (Dkt #17) is denied. His Supplemental Renewed Motion and Declaration for the Appointment of Counsel (Dkt #19) requesting a stay of the initial motion to appoint counsel, and his Motion to Lift the Stay of the Motion for Appointment of Counsel (Dkt #21), are dismissed as moot.

## CONCLUSION

For the reasons stated above, the request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the Petition (Dkt #1) is dismissed. The Motion to Appoint Counsel (Dkt #17) is denied with prejudice. The Supplemental Renewed Motion and Declaration for the Appointment of Counsel (Dkt #19) requesting a stay, and the Motion to Lift the Stay of the Motion for Appointment of Counsel (Dkt #21) are denied as moot.

Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     January 17, 2018
           Rochester, New York

-48-